IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

HEATHER WEIGHTMAN,              )
                Plaintiff,      )
                                )
    v.                          ) Civil Action No. 09-0929
                                )
BANK OF NEW YORK MELLON         )
CORPORATION,                    )
                Defendant.      )

MEMORANDUM

Gary L. Lancaster,                          February 16, 2011
Chief Judge.

This is an action in employment discrimination. Plaintiff, Heather Weightman, alleges that defendant, Bank of New York Mellon Corporation ("BNY Mellon"), discriminated against her based on her gender, specifically her pregnancy and her familial responsibilities, and retaliated against her in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, et seq., and the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. § 951 et seq. Weightman seeks reinstatement, compensatory and punitive damages, and attorney's fees. According to BNY Mellon, it terminated Weightman because she repeatedly violated its no-fault attendance policy, even after receiving a final written warning.

BNY Mellon has filed a motion for summary judgment [doc. no. 21]. BNY Mellon contends that Weightman has failed to establish a prima facie case of gender discrimination or

retaliatory discharge, and, even assuming that she had, has failed to produce sufficient evidence to prove that BNY Mellon's legitimate non-discriminatory reason for her termination was pretextual. In response, Weightman argues that her claims survive summary judgment because she has produced direct evidence that BNY Mellon's termination decision was motivated by her pregnancy and familial responsibilities, and because she has presented a prima facie case of retaliation.

For the reasons that follow, we will grant BNY Mellon's motion for summary judgment.

I. FACTUAL BACKGROUND

Unless otherwise indicated, the following material facts are undisputed. Additional material facts may be discussed elsewhere in this memorandum, in context.

A. Weightman's Employment at BNY Mellon

Weightman was hired on August 28, 2000 by Mellon Financial Corporation, BNY Mellon's predecessor, as an Executive Secretary. In a little more than a year, she had received two promotions, attaining the position of Compliance Analyst I. Weightman initially reported to David Raishart, until April of 2005, when Raishart left Mellon. After he left, Weightman reported to Barbara Speidel until Raishart's replacement, Ann

David, was hired in July of 2005. David then became Weightman's immediate supervisor. David was the only other member of the two-person Regulatory Support Group at BNY Mellon. Speidel remained Weightman's next-level manager and was David's immediate supervisor.

Weightman was promoted to Compliance Analyst II in April of 2006. She remained a member of the Regulatory Support Group, which was managed by Speidel. In July of 2007, as part of Mellon Financial's merger with Bank of New York, the Regulatory Support Group was moved from the Audit Department, which was managed by Barb Speidel, to the Compliance Department, which was managed by Joan Hoffman. As a result, David's manager and Weightman's next-level manager became Joan Hoffman.

It is undisputed that David consulted with Speidel, and later Hoffman, regarding Weightman's performance reviews, flexible work arrangements, attendance issues, and, ultimately, firing. There is no dispute that Weightman's next-level manager, and not her direct supervisor, made decisions regarding Weightman's promotion and raises.

In late 2005, David and Speidel discussed Weightman's flexible work arrangement. Under that arrangement, Weightman was permitted to work from 7:30 a.m. until 3:30 p.m., rather than from 9:00 a.m. until 5:00 p.m., and to telecommute one day a week from home. By October 2006, Speidel and David had

3

decided to "deal with" Weightman's flexible work arrangement in calendar year 2007. On February 28, 2007, Weightman's flexible work arrangement was changed. Although both the 7:30 a.m. to 3:30 p.m. hours and the telecommuting arrangements were identified as creating problems in terms of work load, assignments, and scheduling in the two-person Regulatory Support Group, David and Speidel both signed the form continuing Weightman's flexible work hours, but terminating the telecommuting.

At the same time that David and Speidel decided to "deal with" Weightman's flexible work arrangement in October 2006, Speidel discussed with David, and others, by e-mail, the continued monitoring of Weightman's "negativity." Weightman's 2006 Year End Performance Review, which was delivered in February of 2007, included concerns regarding her "confrontational" communication style with her manager and problems with her interactions and relationships with co-workers in the Audit Department. The review explicitly states that these concerns were "discussed last year." Both Speidel and David signed the 2006 Year End Performance Review on February 28, 2007. This Year End Performance Review rated Weightman's overall performance as "on-target."

By the time Weightman received her Mid-Year Performance Review in July of 2007, her overall rating had dropped to "below-target." At that time, Weightman had received two oral warnings and an initial written warning regarding her attendance. Attendance was listed as a reason for the low rating, as was her "defensive and negative behavior/communication," which was now "overshadow[ing] the quality of the work Heather produces" and creating a "largely uncomfortable" working environment. Weightman submitted a written addendum in response to the July 2007 Mid-Year Performance Review. In it, she indicated that she was unaware that her tone toward David and Speidel was perceived as negative, and that she had apologized to them for the same and wanted to "make things better." Even though Weightman began her addendum with the statement that "some information in this performance management has been mis-represented," Weightman did not dispute the facts surrounding her attendance record, or object to or challenge her managers' concerns regarding the same.

## B. Weightman's Absences

Weightman announced to her co-workers that she was pregnant around January 10, 2007. She gave birth to a daughter on September 20, 2007, and returned to work from her maternity leave on November 14, 2007. During calendar year 2007, Weightman was on short-term disability leave from March 12, 2007 until March 28, 2007, from July 17, 2007 until July 23, 2007, and from August 7, 2007 until November 14, 2007. She took 18 vacation days (five of which she had not earned and was required to purchase) and 1 personal day that year. Seven holidays fell on days that she was not otherwise on leave. She was on vacation, from January 2, 2008 through January 8, 2008, using vacation days to be accumulated in calendar year 2008. Weightman was terminated on January 9, 2008.

BNY Mellon has an Occasional Absence Policy. An occasional absence is a paid day off. The policy counts any absence from work that is not "protected" as an occasional absence. Examples of protected absences are vacation days, holidays, military leaves of absence, leave under the Family and Medical Leave Act, periods of short term disability, and personal leaves of absence. All other absences are considered occasional absences, regardless of the reason for missing work. Examples include illness of the employee, illness of the employee's child, emergency personal matters, or transportation

6

problems. The exact circumstances of the absence, such as whether the employee was actually too sick to make it to work, or could have found alternative transportation to work, are not relevant to whether the absence is characterized as an occasional absence under the policy. If the employee does not report to work and the absence is not "protected," then it is an occasional absence.

The policy counts both the number of days missed, as well as the number of occurrences. An occurrence is one or more days absent for the same or related reasons. For instance, if an employee was home sick with the flu for 3 days, he would incur 3 days and 1 occurrence under the Occasional Absence Policy. However, if he called in sick on Monday, was unable to make it to work Tuesday because his car broke down, and failed to report to work Wednesday because his nanny called off sick and he had to provide emergency childcare, he would incur 3 days and 3 occurrences under the policy.

When an employee has been absent for 8 days or 5 occurrences in a rolling twelve month period, the policy states that the manager should review the employee's attendance record and determine whether corrective action is appropriate. The policy does not require a manager to take corrective action once this 8 day or 5 occurrence threshold is reached, or at any point thereafter. Instead, the policy sets forth guidelines for

managers to utilize in determining whether an employee has an attendance problem that requires management attention.

Although a non-protected absence is always an occasional absence, not all occasional absences are treated equally under the policy. Although absence due to weather conditions that have caused the transportation area to and from work to be closed by federal or state authorities, death of a relative or close friend, and jury duty are classified as occasional absences under the policy they are generally not to be considered when determining possible excessive absenteeism. Therefore, although an employee who missed 10 days of work due to jury duty, 3 days due to the death of a parent, 1 day due to the death of a friend, 2 days due to illness and 1 day due to a personal emergency would meet the 8 day or 5 occurrence threshold (having missed 17 days in 5 occurrences), he would not generally be subject to corrective action under the policy because 14 of those days, and 3 of those occurrences are of the kind generally not to be considered when determining excessive absenteeism.

Weightman had 116 days of protected absences in 2007. Weightman concedes that none of these days were considered for purposes of discipline under BNY Mellon's Occasional Absence Policy. Weightman incurred 16 days and 11 occurrences of occasional absence in 2007. Even without considering the 3 day

absence in June of 2007 as an occasional absence, based on Weightman's contention that David told her those 3 days would not count against her,[1] Weightman incurred 13 days and 10 occurrences in 2007.[2] Weightman met the minimum requirements for corrective action under the Occasional Absence Policy each time that she received corrective action in 2007 even without considering the 3 day absence in June.

## II. LEGAL AUTHORITY

### A. Summary Judgment Standard

The court shall grant summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the moving party meets its burden of proving that no genuine issue of material fact exists, then the nonmoving party "must come forward with 'specific facts showing that there is a *genuine issue for trial*.'". See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)

---

[1] Notably, Weightman did not object to these absences being characterized as occasional absences when she submitted her written addendum in response to her Mid-Year Performance Review in July of 2007, even though she stated in the introduction to the addendum that the review included misrepresentations. [2] Although Weightman now objects to her November 28 and 29, 2007 absences being characterized as occasional absences because she thought that she could use vacation days, it is undisputed that Weightman had no vacation days remaining as of that date, having taken 18 vacation days previously in 2007 (5 of which she had not earned and was required to purchase). No reasonable jury could find that an employee who was required to purchase nearly 30% of her vacation days in that year was not aware that she had no more accrued vacation days available to use by late November.

9

(emphasis in original). When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. Wishkin v. Potter, 476 F.3d 180, 184 (3d Cir. 2007). In ruling on a motion for summary judgment, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986); Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150-51 (2000) (citing cases).

The mere existence of some evidence in support of the nonmoving party will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue under the governing substantive law. See Anderson v. Liberty Lobby, 477 U.S. at 248-49. Moreover, a party opposing summary judgment "must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue." Podobnik v. United States Postal Serv., 409 F.3d 584, 594 (3d Cir. 2005) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). If the nonmoving party fails to make a sufficient showing on an essential element of its case on

10

which it has the burden of proof, the moving party is entitled to judgment as a matter of law. Celotex, 477 U.S. at 322-23.

In summary, the inquiry in ruling on a Rule 56 motion is whether the evidence of record presents a genuine dispute over material facts so as to require submission of the matter to a jury for resolution of that factual dispute, or whether the evidence is such that the movant must prevail as a matter of law.

## B. Title VII Standards

### 1. Gender Discrimination

Title VII of the Civil Rights Act of 1964 prohibits discrimination on the basis of sex.[3] Through the Pregnancy Discrimination Act, "Congress explicitly provided that, for the purposes of Title VII, 'on the basis of sex' includes discrimination 'because of or on the basis of pregnancy, childbirth, or related medical conditions.'"[4] 42 U.S.C. § 2000e(k); Int'l Union, United Auto., et al. v. Johnson Controls, Inc., 499 U.S. 187, 198-99 (1991). The Pregnancy Discrimination Act does not require preferential treatment for pregnant

---

[3] The PHRA and Title VII are "construed consistently" and therefore, we will not discuss Weightman's PHRA claims separately. Gomez v. Allegheny Health Services, Inc., 71 F.3d 1079, 1084 (3d Cir. 1995).

[4] Because we find Weightman's pregnancy discrimination case to be deficient we need not, and do not, address the legal issue of whether pregnancy discrimination can occur when a female employee returns from maternity leave and is no longer pregnant.

11

employees. Doe v. C.A.R.S. Protection Plus, Inc., 527 F.3d 358, 364 (3d Cir. 2008). Instead, it mandates that employers treat pregnant employees the same as non-pregnant employees who are similarly situated with respect to their ability to work. Id.; Rhett v. Carnegie Ctr. Assoc., 129 F.3d 290, 297 (3d Cir. 1997).

Title VII also prohibits sex-plus discrimination. This concept was first recognized by the United States Supreme Court in Phillips v. Martin Marietta Corp., 400 U.S. 542, 544 (1971) and allows employees to advance a gender discrimination claim even if all members of the gender are not discriminated against. In other words, an employer who treats women with small children differently than women without small children would be liable for sex-plus discrimination; with the "plus" being stereotypical assumptions regarding women's childcare responsibilities. However, sex-plus discrimination is still just a form of gender discrimination. Tingley-Kelley v. The Trustees of the Univ. of Pa., 677 F.Supp.2d 764, 774-75 (E.D. Pa. 2010) (citing Back v. Hastings on Hudson Union Free Sch. Dist., 365 F.3d 107, 118 (2d Cir. 2004)). No special legal standards apply. Instead, the ultimate question remains the same as in all gender discrimination cases; i.e., did the employer take an adverse employment action, at least in part, because of the employee's gender. Id. at 775 (citing Chadwick v. WellPoint Inc., 561 F.3d 38, 43 (1st Cir. 2009)).

An employee can establish gender discrimination under Title VII in one of two ways: (1) by direct evidence that the employer's decision was motivated by discrimination; or (2) by indirect evidence that creates an inference of discrimination.

### (a)  Direct Evidence

Direct evidence of discrimination is evidence which, if believed, would prove the existence of a fact in issue without any inference or presumption. Torre v. Casio, Inc., 42 F.3d 825, 829 (3d Cir. 1994). Direct evidence is also described as overt or explicit evidence that directly reflects a discriminatory bias that is causally related to the adverse employment decision. Glanzman v. Metropolitan Mgmt. Corp., 391 F.3d 506, 512 (3d Cir. 2004). Stated another way, direct evidence of discrimination is evidence that demonstrates that "decision makers placed substantial negative reliance on an illegitimate criterion in reaching their decision." Anderson v. Consol. Rail Corp., 297 F.3d 242, 248 (3d Cir. 2002) (citing cases); Fakete v. Aetna, Inc., 308 F.3d 335, 338 (3d Cir. 2002).

If the trier of fact must infer discrimination from the employer's remarks or actions, then the evidence is not direct evidence of discrimination. Torre, 42 F.3d at 829. Only the most blatant remarks, whose intent could be nothing other than to discriminate in reaching an employment decision, are

13

considered sufficient to constitute direct evidence of discrimination. Taylor v. Procter & Gamble Dover Wipes, 184 F.Supp.2d 402, 413 (D. Del. 2002) (citing Clark v. Coats & Clark, Inc., 990 F.2d 1217, 1223 (11th Cir. 1993)). Derogatory comments or stray remarks in the workplace that are unrelated to employment decisions, even when uttered by decision-makers, do not constitute direct evidence of discrimination. Price Waterhouse, 490 U.S. at 277; Fakete, 308 F.3d at 337 n.2; Tingley-Kelley, 677 F.Supp.2d at 776.

When an employee presents direct evidence of discrimination, the case is appropriately analyzed under the test established by the Supreme Court in Price Waterhouse v. Hopkins, 490 U.S. 228, 258 (1989), as modified by section 107 of the Civil Rights Act of 1991. Under the modified Price Waterhouse standard, an employer is liable for discrimination upon proof that a forbidden criterion "was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m). Where an employer proves that it would have taken the same adverse action against the employee even if it did not consider the impermissible factor, the employee will be precluded from seeking damages or reinstatement, but may still be entitled to declaratory relief, certain injunctive relief, and attorney's fees. 42 U.S.C. § 2000e-5(g)(2)(B); Woodson v. Scott Paper Co.,

14

109 F.3d 913, 932 (3d Cir. 1997). An employee attempting to prove discrimination with direct evidence faces a "high hurdle." Walden v. Georgia-Pacific Corp., 126 F.3d 506, 513 (3d Cir. 1997).

### (b) Indirect Evidence

Indirect, or circumstantial, evidence of discrimination is evidence that creates an inference of discrimination. When an employee relies on circumstantial evidence of discrimination, she must first establish a prima facie case before any burden shifts to the employer. McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

To establish a prima facie case of pregnancy discrimination, the employee must demonstrate that: (1) she was pregnant and her employer knew of her condition; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) there is some nexus between her pregnancy and the adverse employment action that would permit a factfinder to infer unlawful discrimination. C.A.R.S. Protection Plus, 527 F.3d at 365. One way to satisfy this fourth element is to demonstrate that similarly situated, non-pregnant employees were treated more favorably. Another way to do so is to produce evidence of temporal proximity between the adverse employment action and the pregnancy.

To establish a prima facie case of sex-plus discrimination based on familial responsibilities, we apply the typical gender discrimination framework under which the employee must demonstrate that: (1) she was a woman with young children; (2) she is qualified for the position; (3) she suffered an adverse employment action; and (4) similarly situated women without young children were treated more favorably, or the circumstances of her termination otherwise give rise to an inference of discrimination. Jones v. Sch. Dist. of Philadelphia, 198 F.3d 403, 410-11 (3d Cir. 1999); see also, Pivirotto v. Innovative Sys., Inc., 191 F.3d 344, 356-57 (3d Cir. 1999); Wooler v. Citizens Bank, 274 Fed.Appx. 177, 180 (3d Cir. 2008).

The bar is low for establishing a prima facie case. Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ., 470 F.3d 535, 539 (3d Cir. 2006) (citing cases). Once the employee has established a prima facie case of discrimination, the burden of production shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for the adverse action. McDonnell Douglas, 411 U.S. at 802. If the employer produces a reason for its action, then the burden shifts back to the employee to demonstrate that the employer's proffered reasons are merely pretextual. Fuentes, 32 F.3d at 763. To establish pretext in order to defeat a motion for summary

16

judgment, the employee must point to some evidence from which a reasonable jury could conclude either: (1) that the proffered reasons are not worthy of credence; or (2) that the real reason for the decision was discrimination. Id. at 763-64.

An employee can discredit an employer's articulated reason for an employment decision by pointing to "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons such that a reasonable factfinder could rationally find them 'unworthy of credence.'" Simpson v. Kay Jewelers, 142 F.3d 639, 644 (3d Cir. 1998). However, an employee cannot simply show that the employer's decision was wrong or mistaken or harsh, because the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer was wise, shrewd, prudent, or competent. Fuentes, 32 F.3d at 765.

## 2. Retaliation

To establish a prima facie case of retaliation under Title VII, an employee must show: (1) that she engaged in protected activity; (2) that the employer took an adverse employment action against her after or contemporaneous with the protected activity; and (3) a causal link exists between the protected activity and the adverse action. Weston v. Pennsylvania, 251 F.3d 420, 430 (3d Cir. 2001). If an employee

17

establishes a prima facie case, then the burden of production shifts to the employer to articulate a legitimate non-retaliatory reason for the action. McDonnell Douglas, 411 U.S. at 802. Upon doing so, the burden shifts back to the employee to show that the employer's proffered reason is pretextual, under the standards set forth immediately above. Id. at 804.

## III. DISCUSSION

### A. Discrimination Claims

#### 1. Direct Evidence

Weightman contends that she has offered direct evidence of pregnancy and familial responsibility discrimination. To restate, direct evidence is "evidence that proves an ultimate fact in the case without any process of inference." Here, the direct evidence must demonstrate that the decision-makers placed substantial negative reliance on Weightman's gender, specifically, on the fact that she was pregnant and the fact that she had familial responsibilities, in reaching their decision to terminate her in January of 2008. See, Price Waterhouse, 490 U.S. at 277.

According to Weightman, she has produced three pieces of direct evidence: (1) David's reaction to her pregnancy announcement; (2) adverse changes in how she was disciplined for absenteeism, in her performance reviews, and in her flexible

work arrangements after announcing her pregnancy; and (3) David's December 4, 2007 comment that "you need to make a decision, either you're going to be a mom or have a career". We will consider each piece of evidence separately in detail below. In summary, we conclude that none of this evidence meets the "high hurdle" of constituting direct evidence of gender discrimination, either separately or considered in concert.

### (a) David's Reaction to Pregnancy Announcement

Weightman contends that David's failure to be happy, congratulatory, or encouraging when she announced her pregnancy in January of 2007 is direct evidence that she was fired in January of 2008 because of her pregnancy. Weightman cites cases from the Courts of Appeals for the Fourth, Fifth, and Sixth Circuits to support her position. Putting aside the fact that these cases are not controlling precedent, the cases do not stand for the proposition that failure to exhibit joy at the announcement of a pregnancy is direct evidence of gender discrimination. Instead, each of these cases deems a negative reaction to a pregnancy announcement to be indirect, or circumstantial, evidence of gender discrimination. As such, Weightman is without any legal authority to support her position that a superior's failure to exhibit joy at the announcement of a pregnancy is direct evidence of gender discrimination.

When we apply the legal standards applicable to determining whether evidence is direct evidence to David's reaction, we conclude that it is not direct evidence of gender discrimination. There is no dispute that David's reaction to Weightman's pregnancy announcement was to ask "How far along are you?" As an initial matter, we do not consider this to be a negative question; it evidences an interest in the expected arrival date of the baby. Weightman would appear to agree and does not even characterize this as a negative reaction to her announcement. Instead, she complains not about the question "How far along are you?" itself, but about David's failure to congratulate her or express joy when she announced her pregnancy. In other words, according to Weightman, a management level employee's lack of excitement at the announcement of a pregnancy is overt or explicit evidence that directly and exclusively, reflects a discriminatory bias in future employment decisions. We find this conclusion to be unsupported by the law.

Regardless, David's comment requires substantial inferences to prove gender discrimination and, therefore, does not qualify as direct evidence of discrimination. Instead, one must infer that because David did not exhibit joy at the news of Weightman's pregnancy, she must have later discriminated against

Weightman on the basis of her pregnancy.[5] David's reaction is simply too attenuated, in time and context, to prove, without inference, that Weightman was fired because of her gender.

Therefore, we find that David's reaction is not direct evidence of gender discrimination.[6]

### (b) Adverse Changes in Treatment

Weightman next contends that a comparison of how she was treated before she announced her pregnancy to how she was treated after she announced her pregnancy provides direct evidence of discrimination. She compares her treatment in three areas: (1) discipline for absenteeism; (2) performance reviews; and (3) flexible work arrangements. We conclude that none of these comparisons constitute direct evidence of gender discrimination because, as a matter of fact, they are not supported by the record.

---

[5] Notably, Weightman admits that Speidel, her next-level manager, and a participant in her performance reviews, flexible work arrangement approval, and corrective action for absenteeism, and the sole authority regarding her promotions and raises, was happy for her when she announced that she was pregnant.

[6] As discussed in section III.A.2., this reaction could be considered indirect evidence of gender discrimination.

### i. Absenteeism

As to Weightman's discipline for excessive absenteeism, the record reflects that prior to 2007 BNY Mellon did not discipline Weightman because she did not meet the 8 day or 5 occurrence threshold under the Occasional Absence Policy. Rather, in calendar year 2006, Weightman had accumulated only 5.5 days of occasional absences. In contrast, each time that Weightman was counseled or issued a warning regarding her attendance in 2007 she met the 8 day or 5 occurrence rule (even excluding the three day absence in June 2007 that Weightman contends David told her would not be counted against her). As such, Weightman was not disciplined prior to announcing her pregnancy because she did not meet the minimum standard to be eligible for discipline under BNY Mellon's policy in 2006. Factually, therefore, this failure to discipline cannot demonstrate gender discrimination, either with or without inference.

### ii. Performance Reviews

Next, Weightman contends that her performance reviews after she announced that she was pregnant are direct evidence of gender discrimination. Again, putting aside the fact that a series of inferences would need to be made to reach the conclusion that negative performance reviews prove that

22

Weightman was the victim of gender discrimination, the record does not support Weightman's factual contention that the substance of her performance reviews changed after she announced that she was pregnant.

Weightman's 2005 Year End Performance Review, which was administered in January of 2006, rated her as "strong". Her 2006 Year End Performance Review, which was administered in February of 2007, rated Weightman as "on-target". The Mid-Year Performance Review administered in July of 2007 rated Weightman as "below-target", which required corrective action. Therefore, there is a decline in the overall ratings Weightman received on her performance reviews. However, both of the reviews administered in 2007 included positive comments regarding, for example, Weightman's writing skills, timeliness, positive interaction with outside examination staffs, and high quality work product. In addition, the two factors that were cited as justifying a lower overall rating, i.e., interpersonal skills and attendance, are not evidence of disparate treatment due to pregnancy under the facts of the case.

The undisputed record reflects that Weightman's interpersonal skills and attitude were a matter of concern prior to January 2007, when she announced that she was pregnant. Specifically, Weightman received oral counseling on this issue during her 2005 Year End Performance Review, as evidenced by a

23

draft of that review, and a notation in the 2006 review that the problem had been discussed last year. BNY Mellon e-mail correspondence reflects that Weightman's managers were monitoring the issue in October of 2006. Factually, it is undisputed that BNY Mellon's concern regarding Weightman's interpersonal skills and attitude did not appear for the first time after she announced that she was pregnant. As such, any alleged change in treatment cannot be direct evidence of gender discrimination.

Although it is true that Weightman was not disciplined for excessive absenteeism until after she announced that she was pregnant, as explained above, prior to that time she was not eligible for corrective action under BNY Mellon's Occasional Absence Policy, having accumulated only 5.5 days of occasional absences in 2006. After she announced her pregnancy, Weightman qualified for corrective action under the policy. This change in factual circumstances, and not Weightman's pregnancy, explains why poor attendance was cited as a negative factor in those performance reviews that occurred in 2007, after she announced that she was pregnant. As such, her discipline for absenteeism after she announced that she was pregnant cannot be direct evidence of gender discrimination.

### iii. Flexible Work Arrangement

Finally, Weightman contends that the change in her flexible work arrangement is direct evidence of gender discrimination. However, as with concerns regarding Weightman's interpersonal skills and attitude, concerns with Weightman's Flexible Work Arrangement predate her pregnancy announcement. In October of 2006, Speidel had already decided to revisit the circumstances of Weightman's schedule in 2007. Notably, Weightman was still not denied a flexible work arrangement after she announced that she was pregnant. Instead, David and Speidel permitted Weightman to retain her flexible work hours, but not her one day a week of telecommuting from home. Factually, BNY Mellon's concern regarding Weightman's flexible work schedule existed before she announced that she was pregnant. As such, this change in treatment cannot be direct evidence of gender discrimination.

Therefore, we find that Weightman's allegedly different treatment before and after she announced that she was pregnant is not direct evidence of gender discrimination.[7]

---

[7] Given the factual deficiencies, this evidence could not even be considered indirect evidence of gender discrimination.

(c)  David's Comment

Weightman contends that David's remark to her that "you need to make a decision, either you're going to be a mom or have a career" is direct evidence that she was fired in January of 2008 because of her gender.  David made this comment to Weightman, in private, on December 4, 2007.  At the time David made the comment, Weightman was already on corrective action for excessive absenteeism, in the form of an initial written warning, and had been counseled on her failure to improve her attendance under it.

Weightman did not report this comment to any other BNY Mellon employee until December 12, 2007, more than a week after it was made.  Moreover, even then, Weightman did not approach human resources to file a complaint.  Instead, Weightman mentioned the comment during a meeting that human resources had called to issue a final written warning for absenteeism.  There is no dispute that human resources refused to address the complaint during that meeting.

While David's remark may have been insensitive and rude, and demonstrates a serious lack of judgment from a management level employee, we cannot conclude that it is direct evidence of discrimination.  As a general rule, a single stray comment, made outside the context of the decision-making process, does not constitute direct evidence of discrimination.

26

Price Waterhouse, 490 U.S. at 277 (derogatory comments or stray remarks in the workplace that are unrelated to employment decisions, even when uttered by decision-makers, do not constitute direct evidence of discrimination); see also, Kennedy v. Schoenberg, Fisher & Newman, Ltd., 140 F.3d 716, 724 (7th Cir. 1998) (statement by law firm partner that "if you were my wife, I would not want you working after having children" does not constitute direct evidence of discrimination against employee who was fired after her pregnancy); Centeno v. Macy's Corporate Services, Inc., 2008 WL 2684578, *4 (D.N.J. Jun. 30, 2008) (personnel director's statement that if employee could get her physician to put her on disability, she could come back to work as long as she was no longer pregnant not direct evidence of discrimination); compare Chervenitski v. County of Luzerne, Dist. Attorney's Office, 2008 WL 425561. *2 (M.D. Pa. Feb. 14, 2008) (statement that candidate (who was a temporary employee) was not selected to fill an open full-time position because she was going on maternity leave is direct evidence of pregnancy discrimination).

Moreover, given the timing of David's comment, it cannot be direct evidence that Weightman was fired because of her gender. At the time the comment was made, Weightman had already been issued a formal initial written warning, and counseled regarding her failure to improve her attendance under

27

it. It is undisputed that after the comment was made, and before Weightman reported it to any other BNY Mellon employee, Weightman missed two additional days of work (December 6 and 7) and a management decision was made to issue her a final written warning. It is undisputed that after receiving her final written warning Weightman missed three more days of work (December 18, 27, and 28). It is also undisputed that Hoffman was still not aware that David had made the comment when she asked human resources on December 27, 2007 whether there was "anything standing in our way that would prevent us from terminating her employment asap?" In light of this timeline, David's December 4th comment cannot demonstrate that decision-makers placed substantial negative reliance on Weightman's pregnancy and familial responsibilities in taking corrective action regarding her absenteeism throughout 2007, up to and including termination in January of 2008.

Finally, we find that any purported factual dispute regarding David's status as a decision-maker in Weightman's termination or as a manager, or the only manager, authorized to discipline her, is immaterial. There is no genuine dispute that David was involved in the decision-making process, up to and including the time that Hoffman became their manager. However, there is also no genuine dispute that David was not the sole decision-maker in her termination. It is undisputed that

Weightman's next-level manager, Speidel, and then Hoffman, was consistently involved in disciplining her. In fact, Weightman admits that it was Speidel, her next-level manager, who orally counseled her in April and June of 2006 regarding her attendance. Speidel signed the initial written warning above David's signature. Speidel also signed Weightman's July 2007 Mid-Year Performance Review, which identified absenteeism as a problem, as did David. Moreover, Weightman acknowledges, and the record reflects, that representatives from BNY Mellon's human resources department were also sometimes present during her discipline. It is not disputed that Hoffman is the official who initiated the termination process at 8:15 a.m. on December 27, 2007 by contacting the human resources department after Weightman called in sick that morning. Finally, it is not disputed that David was on vacation on December 27, 2007.

Viewing the facts in the light most favorable to Weightman, David's single comment, which was not made during the decision-making process, which was not reported to anyone before a final written warning was deemed appropriate, which was unknown to the next-level manager prior to her decision to terminate Weightman, which was made well into the disciplinary process, and which was made before Weightman missed an additional 5 out of 17 days of work (a 30% absenteeism rate), which Weightman concedes was the but-for cause of her

termination, cannot qualify as direct evidence of gender discrimination.[8]

Accordingly, we conclude that Weightman has not offered any direct evidence of discrimination.[9]

## 2. Indirect Evidence

Because Weightman has not produced direct evidence of discrimination, the Price Waterhouse test is inapplicable. Instead, we must proceed under the familiar McDonnell Douglas burden shifting framework. However, Weightman opposed BNY Mellon's motion for summary judgment solely on a direct evidence theory. She has made no argument and presented no evidence under the McDonnell Douglas test, even in the alternative. Regardless, we will apply the McDonnell Douglas test to the evidence and arguments that Weightman has made under the Price Waterhouse test.

Under the McDonnell Douglas test, in order to establish a prima facie case of pregnancy discrimination, Weightman must prove that: (1) she was pregnant and her employer

---

[8] As discussed in section III.A.2., this comment could be considered indirect evidence of gender discrimination.

[9] Even if Weightman had produced direct evidence of gender discrimination, she would nonetheless not be entitled to damages, reinstatement or other such relief because the undisputed evidence reflects that BNY Mellon would have made the same decision absent discrimination because of her poor attendance record. 42 U.S.C. 2000e-5(g)(2)(B). Weightman concedes that the but-for cause of her termination was missing three days of work after she was issued a final written warning and that none of those absences related to post-pregnancy medical conditions or familial responsibilities.

knew of her condition; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) there is some nexus between her pregnancy and the adverse employment action that would permit a factfinder to infer unlawful discrimination.

Under that test, in order to establish a prima facie case of familial responsibility discrimination, Weightman must prove that: (1) she was a woman with young children; (2) she is qualified for the position; (3) she suffered an adverse employment action; and (4) similarly situated women without young children were treated more favorably, or the circumstances otherwise give rise to an inference of discrimination.

We will assume for purposes of this motion that Weightman has presented a prima facie case of both types of gender discrimination. However, before proceeding we will nevertheless discuss whether she was qualified for the position, and whether there is a causal connection between her protected status and her firing.

Weightman must prove that she was qualified for her position in order to establish a prima facie case of gender discrimination. BNY Mellon contends that Weightman was not qualified for her position in the two-person Regulatory Support Group due to her excessive absenteeism. Weightman did not address this issue in her opposition papers. Although BNY

Mellon failed to cite any controlling case law in support of its position, it is generally accepted in the context of employment discrimination litigation that regular attendance is a requirement of most jobs. Smith v. Davis, 248 F.3d 249, 251 (3d Cir. 2001) (ADA); Wilson v. U.S. Air Express, 1999 WL 722820, *5 (E.D. Pa. Sep. 16, 1999) (the ability to attend work on a regular basis is an essential prerequisite of employment). It is undisputed that Weightman had an 11% absenteeism rate. It is also undisputed that Weightman was in violation of BNY Mellon's Occasional Absence Policy throughout 2007. These facts lead us to question whether a reasonable jury could conclude that Weightman was qualified for her position. However, we will assume for purposes of this motion that Weightman could prevail on this factor.

Finally, Weightman must present some evidence from which a reasonable factfinder could make an inference of discrimination in order to establish a prima facie case. Because Weightman has not included any argument under the McDonnell Douglas framework, we must presume that she would rely on the same evidence that she presented under the Price Waterhouse test; namely, David's reaction to her pregnancy announcement, adverse treatment after she announced that she was pregnant, and David's December 4th comment, to prove this element of her prima facie case. Weightman has not presented any

comparators. However, we will not deem this deficiency to require that we grant BNY Mellon's motion, and will instead consider the facts and circumstances of the case to determine whether a reasonable jury could make the required inference of discrimination.

As an initial matter, we have already discussed above, in section III.A.1(b), that Weightman's claims for differential treatment after she announced that she was pregnant are not supported by the undisputed factual record. The issues raised in her performance reviews and the problems with her flexible work arrangement predated her pregnancy. In addition, she was not disciplined for her attendance before she was pregnant because she did not qualify for corrective action under BNY Mellon's policy. Notably, Weightman has produced no evidence that the policy was not enforced against other employees, or was otherwise enforced against her in a discriminatory manner based on her gender, pregnancy, or familial responsibilities.

However, David's reaction to Weightman's pregnancy announcement and her December 4th comment could be considered circumstantial evidence of a discriminatory bias against pregnant women and working mothers, respectively, by a person who participated in the decision-making process. As such, even though this evidence is minimal, we find that Weightman could

33

overcome her low burden to produce some evidence to satisfy the fourth element of her prima facie case.

Assuming that Weightman has established a prima facie case, BNY Mellon has articulated a legitimate, non-discriminatory reason for Weightman's termination; i.e., her poor attendance record. As such, Weightman must point to some evidence from which a reasonable jury could either disbelieve this explanation, or believe that discrimination was more likely than not the real reason for the termination. Weightman can do so by pointing to "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in" BNY Mellon's explanation. Weightman cannot do so by simply showing the BNY Mellon's decision was harsh or unwise. Fuentes, 32 F.3d at 765.

Again, because Weightman has not provided the court with any argument under the McDonnell Douglas framework, we must presume, based on the record before us, that Weightman would identify the same pieces of evidence, i.e., David's reaction and comment, to establish pretext. Weightman might also rely on the close proximity between her return from maternity leave and her termination to prove pretext.

However, we conclude that no reasonable jury could find that this evidence is sufficient to prove pretext under the facts and circumstances of this case. Weightman does not

contend that her attendance records were inaccurate or fabricated, with the exception of her three day absence in June, which she contends David told her would not be held against her. As we have discussed above, however, even without that absence Weightman still qualified for corrective action under the Occasional Absence Policy throughout 2007. Weightman has presented no evidence that other employees were permitted to violate the Occasional Absence Policy without consequence, or that attendance issues were otherwise a ruse for gender discrimination.

By the time that Weightman received oral counseling (twice) regarding her attendance, and an initial written warning, the only piece of circumstantial evidence in existence was that David was not joyful when Weightman announced her pregnancy. David's reaction alone is insufficient to establish that the real reason Weightman was disciplined three times in 2007, and ultimately fired, for violating the Occasional Absence Policy was her gender.

Similarly, David's December 4th comment that Weightman needed to decide whether she wanted to be a mom or have a career does not prove that BNY Mellon's legitimate non-discriminatory reason for her termination was a pretext for gender discrimination. As detailed above, at the time the comment was made, Weightman had already received a formal initial written

35

warning, and been counseled regarding her failure to improve her attendance under it. After David made the comment, Weightman missed 5 days of work in a span of 17 days and was issued a final written warning.

There is no dispute that the comment was made in private. There is also no dispute that the comment was not made known to any other BNY Mellon employee until after management had already decided to issue Weightman a final written warning. Finally, Weightman concedes that the but-for cause of her termination was missing 3 days of work after she was issued a final written warning, and that none of those absences was related to post-pregnancy conditions or familial responsibilities.

Moreover, both pieces of circumstantial evidence could do no more than reflect a possible bias held by David against pregnant females. However, the record reflects that David did not have sole authority to fire Weightman, and did not, in fact, fire her unilaterally. Instead, Weightman's next-level manager and the human resources department participated in each instance of corrective action, both before and after David made the comment. In addition, it is undisputed that Hoffman was unaware of David's December 4th comment, and there is no evidence that Hoffman knew of David's reaction to Weightman's pregnancy announcement, when she initiated Weightman's termination on

December 27th. In light of these facts no reasonable jury could find that attendance problems were a pretext for gender discrimination based on David's reaction or comment.

Nor could any reasonable jury conclude that attendance problems were a pretext based on the temporal proximity of Weightman's firing to her return from maternity leave. Although there is no dispute that Weightman was fired within two months of returning from maternity leave, the progressive disciplinary process had begun well before that time. As such, the temporal proximity is not itself, or even in combination with David's reaction and comment, sufficient to establish pretext in this case.

Therefore, even if Weightman could establish a prima facie case of gender discrimination, she has presented no evidence from which a reasonable jury could find that her excessive absenteeism was a pretext for discrimination. Accordingly, judgment as a matter of law must be entered in BNY Mellon's favor on Weightman's pregnancy discrimination and familial responsibility discrimination claims under the McDonnell Douglas test.

## B. Retaliation Claim

Weightman contends that BNY Mellon fired her in January of 2008 in retaliation for her reporting David's December 4, 2007 comment to the human resources department on December 12, 2007. As explained above, Weightman did not report the comment until a week after it was made and did not approach human resources to make the report. Instead, Weightman only reported the comment when she was informed that she was receiving a final written warning for absenteeism.

There is no question that Weightman can establish the first two elements of her prima facie case -- protected activity and adverse employment action. According to Weightman she has satisfied the final element of her prima facie case, a causal connection, by presenting evidence that: (1) the decision to terminate her was made within days of her December 12th complaint; (2) David complained to human resources about her "constant badgering" regarding vacation days within about a week of her December 12th complaint; (3) David complained to human resources about Weightman within days of Weightman raising a concern with David regarding discrimination in May of 2007; and (4) human resources refused to address or investigate the complaint.

While we express our doubt that this evidence could prove the required causal connection, we will assume for purposes of this motion that Weightman has established a prima facie case. However, as with her discrimination claims, Weightman's retaliation claim cannot survive summary judgment because Weightman has produced no evidence that absenteeism was a pretext for retaliation.

Although Weightman recognizes that this claim must be analyzed under a burden shifting framework, she still does not identify any evidence of, or make any argument regarding, pretext. Therefore, we must presume that Weightman relies on the same four pieces of evidence identified above in order to prove pretext.

We find that no reasonable jury could conclude that poor attendance was a pretext for retaliation based on this evidence. The temporal proximity between Weightman's report to human resources and termination is not probative under the circumstances of this case. Weightman's termination was simply the final action in a progressive disciplinary process that began well before Weightman mentioned David's comment to human resources on December 12, 2007. It is undisputed that the decision to issue a final written warning was made before Weightman mentioned David's comment to human resources. It is also undisputed that Hoffman, who was the manager to formally

initiate the termination process, did not know that Weightman had mentioned David's comment to human resources before she did so. Moreover, Weightman concedes that she would not have been fired had she not incurred three absences within 15 days of receiving a final written warning. Therefore, under these circumstances, no reasonable jury could find that absenteeism was a pretext for retaliation because Weightman's termination came less than a month after she reported David's comment to human resources.

Similarly, the fact that David complained about Weightman to human resources after Weightman accused David of discriminating against her, does not establish pretext for purposes of summary judgment. Weightman was already on corrective action when David made the first complaint to human resources in May of 2007. In addition, this complaint was made almost eight months before BNY Mellon terminated Weightman. When David made the second complaint about Weightman to human resources on December 20th, Weightman had already been issued a final written warning and missed a day of work (December 18). As such, no reasonable jury could find that David's complaints about Weightman prove that Weightman was fired not because she missed three days of work in the span of just over two weeks after being issued a final written warning, but instead because she notified human resources of David's comment.

Likewise, no reasonable jury could find that BNY Mellon's failure to investigate Weightman's report proves that absenteeism was a pretext for retaliation. Human resources did investigate David's comment.

As such, even if Weightman could establish a prima facie case of retaliation, she has presented no evidence from which a reasonable jury could find that her excessive absenteeism was a pretext for retaliation. Accordingly, judgment as a matter of law must be entered in BNY Mellon's favor on Weightman's retaliation claim.

## IV. CONCLUSION

Because Weightman has failed to produce sufficient evidence to support any of her claims, summary judgment must be entered in favor of BNY Mellon.

An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

HEATHER WEIGHTMAN,          )
            Plaintiff,      )
                            )
    v.                      ) Civil Action No. 09-0929
                            )
BANK OF NEW YORK MELLON      )
 CORPORATION,               )
            Defendant.      )

ORDER

AND NOW, this _16_ th day of February, 2011, it is HEREBY

ORDERED that Bank of New York Mellon Corporation's motion for

summary judgment [doc. no. 21] is GRANTED.

        The Clerk of Court is directed to mark this case

CLOSED.

                        BY THE COURT,

                        _____, C.J.